Filed 4/30/14  In re G.J. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.J., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E059773 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1100430) |
| v. | OPINION |
| E.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Anna M. Marchand, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION

Mother's abuse of drugs and alcohol, domestic violence, and mental health issues

led to the Riverside County Department of Public Social Services, Child Protective

Services (CPS) removing mother's three young children from her care.  The oldest of the

three children, G.J., was four years old at the time (born in 2006).  Mother's two other

children by a different father, A.B. (born in 2010) and M.B. (born in 2011), are not the

subject of this appeal.

Mother appeals the order terminating her parental rights as to G.J. under Welfare

& Institutions Code section 366.26.[1]  She also appeals the order denying her petition

brought under section 388 (section 388 petition).  Mother contends G.J. was not

adoptable because of his behavioral problems, and the trial court abused its discretion in

denying her section 388 petition because she established changed circumstances and that

ordering additional reunification services was in G.J.'s best interest.  We disagree.  The

court did not abuse its discretion in denying mother's section 388 petition and

terminating parental rights as to G.J.  The judgment is affirmed.

II

FACTS AND PROCEDURAL BACKGROUND

On June 26, 2011, CPS received a referral stating that law enforcement responded

to calls from mother's neighbors, reporting that she was screaming.  Both mother and her

_____

[1] Unless otherwise noted, all statutory references are to the Code of Welfare and
Institutions.

2

live-in boyfriend, Nick, had injuries and were intoxicated.  Nick was the presumed father of G.J.'s younger siblings, A.B. and M.B.  Mother and Nick admitted they had pushed each other.  Mother reported that, while Nick was holding M.B., he punched a truck.  Mother admitted to having been involved in incidents of domestic violence in the presence of her children since 2010.  Nick admitted to past and present alcohol and drug abuse, including recently smoking marijuana.  Mother and Nick were arrested for willful infliction of corporal injury upon a cohabitant (Pen. Code, § 273.5, subd. (a)) and child endangerment (Pen. Code, § 273a, subd. (a)).  Nick and mother had extensive criminal histories, which included assault, spousal battery, disorderly conduct, and driving under the influence of alcohol.

On June 27, 2011, the CPS detained G.J., M.B. and A.B. because of the domestic violence between mother and Nick, resulting in their arrest.

*Juvenile Dependency Petition*

On June 28, 2011, CPS filed a juvenile dependency petition on behalf of the three children, alleging violations of section 300, subdivision (b) (failure to protect) and (g) (no provision for support).  CPS alleged in the petition that mother and Nick engaged in domestic violence in the presence of the children; mother and Nick abused alcohol and drugs; mother and Nick had a criminal history and were charged with child endangerment and corporal injury; mother and G.J.'s father (father) had a history of child neglect, resulting in the removal of their five-week-old child, and termination of parental rights; mother suffered from unresolved mental health issues, including depression, anxiety, and panic disorder; father was not a member of G.J.'s household, his whereabouts were

3

unknown, and he had failed to provide his child with adequate care, support, and protection; and mother and Nick were currently incarcerated and unable to arrange for care and support of their children.

At the detention hearing on June 29, 2011, the juvenile court ordered the children detained.

*Jurisdiction/Disposition Hearing*

CPS reported in its jurisdiction/disposition hearing report filed in July 2011, that G.J. stated during an interview in July 2011, that, during the domestic violence incident leading to mother's arrest, mother was holding him in her arms and "smacked" Nick in the head. When asked if mother abused alcohol or drugs, G.J. said, "She's a bad girl, my mom. My mom taught me to talk to beer. She drinks all kinds of beer and soda."

CPS reported that during mother's interview, she said she had been sexually abused when she was a young child. She last worked in 2008. She met Nick in 2009, and had been living with him for two and-a-half years. Mother acknowledged she needed to stop drinking, and she and Nick needed counseling as a couple. CPS located father, who lived in Washington.

In August 2011, paternal grandmother (Nick's mother) reported that, when she went to pick up mother and Nick for their scheduled visit with the children, mother got into a physical altercation with Nick. Mother hit and bit Nick. The following day, mother and Nick reconciled. Mother and Nick tested positive for marijuana in August 2011. CPS reported that mother continued to abuse drugs, including marijuana. During mother's visits, she appeared to have no control over the children. Mother's visits

4

reportedly were "chaotic." During one visit, G.J. screamed at mother. She did not respond and then began to cry.

CPS received a report that while mother was living in Washington State in 2011, mother reported in June 2011, that she witnessed G.J. being molested by the twin eight-year old sons of her father's girlfriend. Mother also said that on two occasions within the past two months, she had also witnessed G.J. performing oral sex on the twins.

At the jurisdiction/disposition hearing on September 6, 2011, the juvenile court sustained the section 300, subdivision (b) allegations (failure to protect) and ordered the three children removed from mother's custody. The court also ordered CPS to provide mother with reunification services and authorized visitation.

*Six-Month Review Hearing*

On September 21, 2011, the children moved to the home of Nick's mother and step-father (paternal grandparents). CPS reported in the six-month hearing report filed in February 2012, that mother and Nick were living with Nick's father. The trial court ordered mother to undergo a psychological evaluation, which took place in August 2012. Mother was diagnosed with posttraumatic stress disorder (PTSD) from abuse, depression, and anxiety. G.J.'s foster mother (paternal grandmother) reported that G.J. had some behavioral problems at home and at school. When he got mad, he hit, kicked, and pushed other children, including his brother. His behavior got worse after he saw mother. G.J. was seeing the school psychologist. Paternal grandmother reported that G.J. told her his maternal uncles had "touched" him on his "butt" and "pee pee," and G.J. did the same

5

thing to them. He also said he had to take showers with his uncles. Paternal grandmother said it was difficult caring for all three children.

Paternal grandmother supervised the children's visits with mother. Nick appeared to be more involved with the children than mother. G.J. was hyperactive. Paternal grandmother suggested mother receive some parent education because she often threatened to leave the children and not return when G.J. was not behaving. Mother reportedly was still testing positive for marijuana and had inquired about getting a medical marijuana card.

CPS reported in an addendum report that mother and Nick both tested positive for marijuana in February 2012. Mother's attendance at a substance abuse program was sporadic. Mother and Nick were attending a parenting class. Mother completed an anger management course in January 2012. At the six-month hearing, the juvenile court continued mother's reunification services and terminated both fathers' services.

*12-month Review Hearing*

CPS reported in its 12-month hearing report filed in September 2012, that on April 16, 2012, the sheriff's department received a report that mother had been assaulted by her boyfriend, Nick. Mother said she had been severely drunk and Nick had thrown something at her, but she denied that he had injured her. She would not identify the person who had caused her injuries. In August 2012, Nick's father told CPS that it was very difficult having mother live in his home because she and Nick often engaged in physical fights, usually when mother was under the influence of alcohol. Mother had hit

6

Nick and Nick's father, and had kicked holes in the door. One such fight was in mid-July 2012 and the other was during the end of July.

Nick's father also said he believed mother was ingesting copious amounts of water and vinegar to help her pass her drug tests. Sheriff's department records showed that there were calls reporting a fight and domestic violence on May 13, 2012, and August 2, 2012. The May 13, 2012 call was from Nick's father, who stated that his "son's girlfriend [was] very drunk and verbal." The officer responding to the August 2, 2012 call, reported that mother said her boyfriend was being "verbal and physical." She also complained Nick's father was being abusive and would not let her leave. Nick's father told the officer mother was free to leave and he wanted her to. The officer noted mother and Nick had been drinking alcohol and, in the officer's opinion, mother was the one causing the problems.

On June 1, 2012, mother was referred to a substance abuse program, Hacienda Valdez, and completed the structured recovery program on July 15, 2012. CPS reported that mother refused to drug test on September 11, 2012, missed at least seven random drug tests, and tested positive for marijuana on September 27, 2012. Mother was also abusing alcohol and was still with Nick. CPS concluded mother had not benefited from anger management classes. Mother reportedly was very violent towards Nick and Nick's father, and mother and Nick still engaged in domestic violence and abused alcohol.

Mother was authorized to visit the children once a week for two hours. Visitation was supervised. Visits went well. The children remained with paternal grandparents. The CPS social worker reported that G.J. appeared to be very active, happy and friendly

7

but had some behavioral problems, which included hitting, kicking, and pushing others at home and at school. G.J. attended weekly therapy provided by a school psychologist during the past year, and was currently participating in weekly therapy to address issues of past sexual abuse by family members and a few incidents between G.J. and his siblings, in which he inappropriately touched them. Mother reported in July 2012, that Nick said G.J. told him G.J. had touched A.B. and M.B. G.J. told mother he did not do it, and that he told Nick he did it because paternal grandparents told him to say it.

According to an addendum report filed in October 2012, mother had moved out of paternal grandfather's home and was living with friends. She did not appear for her random drug test on October 12, 2012, and did not appear on September 19, 2012, for a substance abuse counseling appointment.

At the status review hearing on October 29, 2012, the juvenile court terminated mother's reunification services and set a section 366.26 hearing. During the hearing, the court noted mother had not fully complied with her case plan, she had not tested regularly, she recently tested positive for marijuana, and she continued to live with Nick. The court concluded that there was not a substantial likelihood of the children returning to mother if she were given additional services.

*Section 366.26 Hearing and Section 388 Petition*

CPS reported in its section 366.26 hearing report filed in February 2013, and addendum reports filed in February and March 2013, that the children had been placed with paternal grandparents since September 21, 2011. G.J. was happy, friendly, in good health, had met his developmental milestones, and loved to play. He was in kindergarten

8

but reportedly defiant at school. He did not listen or follow directions. G.J. had been suspended from school for his aggressive behavior and was no longer allowed to ride the school bus because he screamed, ran around, and would not sit in his seat. G.J. told paternal grandmother that he "touched [A.B.] on his privates." Paternal grandmother saw G.J. sitting next to A.B., rubbing A.B.'s penis. G.J. was aggressive towards his younger siblings and therefore needed to be supervised at all times. G.J. also frequently wet his bed. G.J. was currently attending Parent-Child Interaction Therapy once a week.

CPS reported in a preliminary assessment of paternal grandparents as adoptive parents that G.J. had vivid memories of police contact with his parents. He said he wanted to live with mother and it was fun living there. The CPS social worker concluded that G.J. was attached to paternal grandparents but was having emotional problems due to his past trauma/abuse and grief and loss. The social worker concluded that G.J. was adoptable, even though paternal grandparents did not want to adopt him because of his emotional problems. Paternal grandmother said she wanted to adopt A.B. and M.B. but did not believe she could handle G.J.'s behavioral problems long term. Paternal grandmother believed paternal grandparents would be overextending themselves adopting the three children. She was concerned that G.J.'s behavior would negatively impact the younger children and that his sexually acting-out would continue. Paternal grandmother wanted G.J. moved to another relative's home. Supervised visitation continued once a week, for two hours.

In the March 2013 addendum report, CPS reported mother wanted the children removed from paternal grandparents and claimed paternal grandparents had engaged in

9

domestic violence. In addition, paternal grandmother did not allow mother to visit the children. Mother recorded paternal grandmother yelling at the children. Paternal grandmother denied the accusations but said there had been domestic violence between her and her ex-husband (Nick's father), whom she divorced in 1997. She married paternal step-grandfather in 2006, and said they had not had any domestic violence. As to allegations she would not allow mother to visit the children, paternal grandmother said it was mother who had not requested visitation during the past two months.

At the section 366.26 hearing on March 18, 2013, the juvenile court found A.B. and M.B. adoptable, and terminated parental rights. The court further stated that, as to G.J., "at this point, . . . I can't necessarily make that finding." The court therefore found G.J. was not adoptable and continued the section 366.26 hearing as to G.J.

In May 2013, CPS requested mother's visitation with G.J. be reduced because his behavior worsened before and after visits with mother. Paternal grandmother reported that G.J. kept hitting A.B. and M.B., and paternal grandmother was concerned about the younger siblings' well-being. She wanted G.J. removed from her home because she was overwhelmed with his aggressive behavior. During an ex parte hearing to limit visitation on May 20, 2013, the juvenile court ordered supervised visits reduced to twice a month.

On June 13, 2013, G.J. was moved from paternal grandparents' home to another prospective adoptive home. His new prospective adoptive parents were fully advised of his behavioral problems. They were in the process of also adopting a seven-year-old boy, with whom G.J. immediately bonded as a brother. During G.J.'s visits with mother, mother was attentive but there was not a lot of interaction. After mother visited G.J. on

10

June 27, 2013, G.J. became aggressive with his prospective adoptive brother. G.J. told his prospective adoptive mother he worried about visiting mother and did not want to see her because of his memories of her slapping him and drinking. G.J.'s affection for mother appeared reserved.

In August 2013, CPS reported that G.J.'s behavior had substantially improved since his placement with his prospective adoptive family and was doing well in his new placement. He had stopped bedwetting. G.J. was a happy, friendly child. He was discharged from therapy in June 2013.

On July 9, 2013, mother filed a section 388 petition, requesting the court to change the October 29, 2012 order terminating reunification services. CPS filed addendum reports on July 10, 2013, and July 15, 2013, stating that G.J. was doing well in his prospective adoptive home. Mother was currently living at Hacienda Valdez transitional housing, was unemployed, and seeking housing shared with friends. Mother was pregnant with her fifth child, which was due in October 2013. Mother reported that Nick was the father. Nick was incarcerated for committing domestic violence against mother.

On September 27, 2013, the juvenile court conducted a combined section 388 and section 366.26 hearing. The court denied mother's section 388 petition, found G.J. was likely to be adopted, and terminated mother's parental rights.

III

G.J. WAS ADOPTABLE

Mother contends the juvenile court erred in finding G.J. adoptable. We disagree.

11

At a section 366.26 hearing, the juvenile court is charged with determining the most appropriate permanent plan for a dependent child who has been unable to reunify. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  A section 366.26 hearing is designed to protect a dependent child's "compelling" right "to have a placement that is stable, permanent, and allows the caretaker to make a full emotional commitment to the child." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.)  Adoption is the plan preferred by the Legislature because it is the most permanent of the available options.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)  If a court finds that a child is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds a "compelling reason for determining that termination would be detrimental to the child" due to one or more of the exceptions to adoption specified by statute.  (§ 366.26, subd. (c)(1)(B); see also *In re A.A.,* at p. 1320.)  In the instant case, the juvenile court terminated parental rights, finding that termination of parental rights would not be detrimental to G.J. and none of the statutory exceptions to adoption applied.

In reviewing the juvenile court's finding of adoptability under the substantial evidence test (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562), we must look at the complete record in the light most favorable to the findings and draw all inferences to support the ruling (*In re R.C.* (2008) 169 Cal.App.4th 486, 491).  We "determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, that the [child] is adoptable.  [Citation.]"  (*Ibid.*)  "'Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold:  The court must merely determine that it is "likely" that

12

the child will be adopted within a reasonable time.' [Citation.]" (*In re D.M.* (2012) 205 Cal.App.4th 283, 294, fn. 3.)

"'The issue of adoptability . . . focuses on the [child], e.g., whether the [child's] age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.]' [Citation.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) Where a prospective adoptive parent is willing to adopt a child with physical, mental, and/or emotional limitations, the court has a legitimate basis for finding such limitations "are not likely to dissuade individuals from adopting the [child]." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650.) "In other words, a prospective adoptive parent's willingness to adopt generally indicates the [child] is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. [Citation.]" (*Id.* at p. 1650, italics omitted.)

Mother argues that the evidence established that G.J. was not adoptable. Such evidence included evidence G.J. was severely aggressive and acted out sexually toward other children. In addition, he was seven years old, which mother argues is older than the age of children most people wish to adopt. Also, G.J. was sexually abused and his behavioral problems resulted in his paternal grandparents deciding not to adopt him. Mother argues it is likely his new prospective adoptive parents will decide not to adopt G.J. and, therefore, if parental rights are terminated, he will be left an orphan.

Although there is evidence that G.J. has had serious behavioral problems and has suffered from sexual abuse, there is also substantial evidence that he is nevertheless adoptable. His first prospective adoptive parents initially were agreeable to adopting him

13

but decided not to upon concluding they were overextending themselves by attempting to care for the three children, plus another grandchild. G.J.'s behavioral problems, which were endangering the other grandchildren, were more than paternal grandparents could cope with. Furthermore, paternal grandparents were not related to G.J., whereas they were related to the other children. G.J.'s subsequent prospective adoptive parents, on the other hand, were willing to adopt him under circumstances that proved to be more conducive to providing G.J. with a stable, nurturing home.

CPS reported that G.J. is a happy, bright, active, friendly, healthy child, who immediately bonded with the seven-year-old son of his prospective adoptive parents and viewed him as a brother. It was not until after G.J. visited with mother that G.J. acted aggressively toward the boy. The evidence demonstrates that G.J. struggled emotionally after visiting with mother. He told his caretakers that he did not want to visit with mother because visiting with her evoked painful memories of her slapping him and mother drinking. Because of the apparent emotional turmoil G.J. experienced when visiting with mother and his consequential acting out after visits, mother's visitation was reduced in May 2013, from once a week, to twice a month. Additional evidence of adoptability included CPS's August 2013 report, in which CPS stated that G.J.'s behavior had substantially improved since his placement with his new prospective adoptive family in June 2013. He had stopped bedwetting. G.J. was reportedly a happy, friendly child. He was discharged from therapy in June 2013, and was doing well in his new prospective adoptive home. Because of this, there was reportedly no need for him to continue

14

therapy. There was substantial evidence that, with therapy, G.J.'s behavioral problems had significantly diminished, if not resolved, and he was doing well in his new home.

G.J.'s prospective adoptive family was fully informed of G.J.'s behavioral problems and tumultuous past, and nevertheless wanted to adopt him. G.J. moved in with the family on June 13, 2013, and had lived with the family for over three months when parental rights were terminated on September 27, 2013. The fact there are prospective adoptive parents alone is evidence of the likelihood of adoption. (*In re Sarah M., supra,* 22 Cal.App.4th at pp. 1649-1650.) In addition, CPS reports demonstrate G.J. has many good qualities, which is an important factor showing adoptability. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)

There is no question G.J. has had serious behavioral problems and has been subjected to some very traumatic experiences as a young child, and may continue to have behavioral problems. But there is substantial evidence that G.J.'s conduct has improved significantly, he is doing well in his prospective adoptive home, and he is adoptable. G.J. expressed a desire to live with his new prospective adoptive family until he is an adult. We see no valid basis for depriving G.J. of the opportunity to grow up in a permanent, stable adoptive home.

IV

SECTION 388 PETITION

Mother contends the trial court abused its discretion in denying her section 388 petition seeking additional reunification services and a permanent plan of returning G.J. to her custody.

15

*A. Applicable law*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The parent bears the burden to show both '"a legitimate change of circumstances"' and that undoing the prior order would be in the best interest of the child. [Citation.] The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion. [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959-960 [Fourth Dist., Div. Two].)

In evaluating whether parents have met their burden to show changed circumstances, the trial court should consider: (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.) These factors become less significant once reunification services have been terminated, as in the instant case. This is because, "[a]fter the termination of reunification services, . . . 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

*B. Facts and Procedural Background Relating to Mother's Section 388 Petition*

Mother asserted in her section 388 petition that her circumstances had changed and that granting her petition was in G.J.'s best interest. In response to mother's petition,

16

CPS filed addendum reports in July 2013, stating that G.J. was doing well in his prospective adoptive home. He was getting along well with his foster parents and their seven-year-old adoptive son. A few days before mother's visit with G.J. on June 27, 2013, he said he did not want to see mother. His caregivers reported that after the visit, G.J. regressed and became aggressive towards their adoptive son. Also, although mother was attentive during her visits, there was little interaction between her and G.J.

On September 27, 2013, the juvenile court conducted a combined section 388 and section 366.26 hearing, during which mother testified that she was continuing to participate in a drug treatment program because she needed structure to maintain sobriety. According to mother, the last time she used marijuana or any other drugs was in October 2012. Mother did not know when Nick would be released from custody. She said she did not intend to reunite with him because she did not want to be in an abusive relationship with him. Mother had recently moved into Martha's Village homeless shelter and was attending relapse prevention classes. Mother believed G.J. could live with her in the shelter.

Mother further testified that in August, 2013, G.J. told her he missed her and wanted to go home with her. Mother believed she had a good relationship with him. When he was with her, he seemed happy and strongly bonded to her. Mother was concerned G.J. might think she did not care about him or love him or want him, but this was not true. Mother agreed that G.J.'s current placement should continue but did not want him adopted. Mother wanted him transitioned to living with her.

17

The juvenile court denied mother's section 388 petition, found G.J. was likely to be adopted, and terminated mother's parental rights. The court concluded that mother was in the process of changing her circumstances but her circumstances had not changed sufficiently, and it was in G.J.'s best interests to remain in his current placement.

## C. Changed Circumstances

Mother argues the juvenile court erred in finding her circumstances had not changed. For the second time, she completed a residential substance abuse treatment program and she had not tested positive for marijuana after the hearing terminating her reunification services. She had been drug-free for 11 months. Mother had also completed an eight-week parenting class, a 12-week Seeking Safety Program, and an eight-week anger management program. Mother testified at the hearing on her section 388 petition that she had ended her relationship with Nick and had moved into Martha's Village homeless shelter to avoid conflict with him and domestic violence.

Although mother was making a concerted effort to improve her circumstances, the record shows that, while her circumstances were improving, they were not sufficiently changed for purposes of granting mother's section 388 petition. Mother had relapsed before, after completing a residential treatment program, and had not established that she could successfully live a substance-free existence once she was no longer living in transitional housing. She had only recently moved from the residential treatment program to a homeless shelter, which provided her with relapse prevention courses. Mother acknowledged she needed to remain in a structured environment to maintain

18

sobriety. Mother has not established she can maintain sobriety on her own for an extended period of time.

Furthermore, although mother testified her relationship with Nick had ended, this also was questionable since mother was pregnant with Nick's child and Nick was currently incarcerated for domestic violence with mother. Mother said she did not know when he would be released. Under such circumstances, the juvenile court could reasonably conclude that it was likely mother would reunite with Nick upon his release, as she had consistently done in the past, with her dysfunctional relationship with Nick leading to repeated incidents of domestic violence and substance abuse.

Four of mother's children, including G.J., were removed from mother's custody because mother was abusing alcohol and drugs and engaging in domestic violence. Mother has a lengthy history of participating in treatment for these problems and then relapsing. Under such circumstances, we conclude mother has not met her burden of establishing changed circumstances.

*D. G.J.'s Best Interests*

Mother argues that granting her section 388 petition is in G.J.'s best interests because G.J. was closely bonded to her and wanted to continue visiting with her. Mother testified at the hearing on her section 388 petition that G.J. told her he missed her and wanted to come home. Mother argues that she had consistently visited him, their visits went well, and G.J.'s current home was not a permanent home. Mother maintains that, even though G.J. had a prospective adoptive family, it was not likely the family would adopt him because of his behavioral problems of sexually acting out and displaying

19

aggression and defiance.  Mother believes G.J. is not adoptable and, therefore, since he is strongly bonded to her, continuing their relationship is in his best interests.

We do not agree.  Mother has not met her burden of establishing it is in G.J.'s best interests to grant her section 388 petition.  The evidence shows that at the time of the hearing on the section 388 petition, G.J. was not strongly bonded to mother.  G.J. had not lived with her for over two years and visitation had been limited initially to weekly supervised visits, and then reduced to twice a month.  There reportedly was limited interaction and affection between mother and G.J. during visits.  Several times G.J. had said he did not want to see mother because visits evoked painful memories of the past. G.J.'s aggression and acting out before and after visits reflected G.J.'s inner turmoil caused by his visits with mother, which resulted in the trial court reducing visitation from weekly supervised visitation, to visits twice a month, and ultimately finding it was not in G.J.'s best interests to grant mother's section 388 petition.

In addition, G.J. had bonded with his new prospective adoptive parents and their son, and his behavioral problems, including bedwetting, aggressiveness, and sexually acting out, had significantly improved, to the degree that he had been discharged from therapy.  G.J. appeared to be happy in his new home and said he wanted to live there until he grew up.  Mother conceded that G.J. should continue in his current home, although she wanted him transitioned to custody with her.  Mother has not met her burden of establishing that granting her section 388 petition is in G.J.'s best interest, particularly in light of her lengthy history of domestic violence, substance abuse, and relapsing following rehabilitation, as well as the likelihood of mother reuniting with Nick.

20

## V

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RICHLI
Acting P. J.

MILLER
J.

21